We'll now hear United States v. McCormick. Mr. McCormick is currently serving three concurrent sentences of 77 months, and I'll note that I am neither 40 nor 41 years old. So, while courts are not prone to or supposed to second guess an attorney's trial strategy where one is a parent, that's not absolute. This court held in Eazey v. Senkowski, if certain omissions cannot be explained convincingly as resulting from a sound trial strategy, but instead arose from oversight, carelessness, ineptitude or laziness, that the court would find the quality of representation sufficiently deficient to find ineffective assistance at counsel. Mr. Segal, I haven't had that many criminal trials, but even I have had at least one trial where as a tactic, if not as part of the strategy, the defendant has conceded that he was . . . that it could be shown that he was guilty of some part of the large number of crimes with which he was charged. Why is that not . . . I believe this is a tactic that's been used more than once. I think, Judge, that that's absolutely correct. There are circumstances in which that is a reasonable trial strategy. Certainly where what the defense counsel is conceding are crimes that are of lesser significance, with lesser sentencing exposure, than the ones he's not conceding. In this instance, there's two points to be made. First of all, when defense counsel conceded the two specific sales, he was conceding two charges of violations of Section 841B1C. The conspiracy charge was no more serious than that. He was essentially . . . the benefit to him or to his client in doing that would have been limited to a determination subsequently of the quantity of drugs for which his client was responsible. I take it that the reason that he did it was because he wanted to build credibility with the jury. That certainly would appear to be the case, but the question is, what is he going to get out of it? He will have credibility, so what's the argument that he's then going to drive home with this enhanced credibility? The evidence of the sale is he's on videotape. Correct. He's on . . . the two transactions are recorded. He's hard-pressed to say, that ain't me. What's his lawyer supposed to say? You know, it really looks like him. You know, it looks startlingly like him, but it's not him. The question of credibility makes a great deal of sense, but what his lawyer said was, look, okay, he did this, but where's the proof on the federal side with regard to the conspiracy? Maybe there's stuff about that he bought drugs from the federal CI, but there's no proof that these are all part of a chain that then ends up being distributed, and so therefore he's responsible for all that. That seems like, you know, sometimes you don't have the law or the facts on your side, and you're left with trickery and deceit, as my law professor once told me. So you only got so much cloth to make the suit of clothes with. I mean, he's in a rock . . . he's between a rock and a hard place, isn't he? There's no question about it, Judge. The reality is I've done far more trial cases than I have appeal cases, so I'm well familiar with that . . . You've been there, Mr. Siegel. I have been, but, you know, in this case, he did more than simply concede that that was his client who had done those sales. Because what he also did was he vouched for the way the Schenectady Police Department, who were running the CI who made those purchases, he vouched for how they did their job. Well, because he wasn't charged with conspiracy in the state court, he was just charged with sale, right? No. I mean, this was all . . . Was he charged with conspiracy in the state court? It wasn't a question of being in the state court. Was he charged with . . . were there state charges that arose out of the Schenectady Police work that . . . state charges that charged him with conspiracy? Not that I am aware of. No, but the feds then used both the state activity and the other activity that they had to build the conspiracy and the 841 claims, right? That is correct. Okay, all right. So, Mr. McCormick could have been convicted of either a conspiracy involving this guy FBI investigation, or he could have been convicted of conspiracy by working with this fellow Bones with regard to the sales to the state CI. And so, when he vouched for the way the Schenectady Police Department had gone about its business, he essentially credited their investigation, credited that, and actually the state . . . the because he said that later on, on July 8th, 2014, after the first of those two sales, when he was debriefing the CI, he claims that the CI gets a phone call from Mr. McCormick saying . . . in which Mr. McCormick provides the phone number for this fellow Bones, basically putting the final nail in the coffin of a conspiracy charge there. So, if nothing else, defense counsel had to attack that testimony . . . Can I ask you just a quick procedural question, because I don't want your time to run out. His lawyer . . . isn't there an assertion that his lawyer had the McCormick's approval of this? He does assert that, and that's the extent of the record at this point. Right, and so my next question is, isn't this better left to collateral review than opposed on direct appeal, because then you could develop the record as to why he did it, why the attorney did it, and flesh out what . . . it doesn't appear here as any kind of argument about prejudice, other than the fact that he was convicted. That's certainly one avenue the court could take. I would believe that the court could also simply remand the case to the district court for fact finding, and that could be included there. Okay. Thank you. Thank you, Judge. Thank you, Mr. C. Thank you. Thank you. Thank you. Thank you. May it please the Court. Rajiv Dosanjh for the United States. The government believes, in line with the request made by the defendant, that you can decide this case on direct appeal. Under Strickland, he has to show prejudice, and I think the case here will founder on that, because the evidence of his . . . of course, his involvement with the two substantive sales and the conspiracy was overwhelming. He has to show a substantial likelihood of a different outcome, had his attorney not made this concession in his closing argument. The evidence of all three charges was, again, overwhelming. He had the testimony of MS, the cooperator, that he fronted drugs to both Bones and McCormick. He collected the balance from Bones, not from McCormick. You have the testimony of JP, who says that McCormick and Bones were known to work together. He twice witnessed Bones and McCormick pooling their money. He traveled with McCormick and Bones and Fats to Rutland, Vermont, to sell crack. You have audio calls from jail in 2015, where McCormick indicates that Bones has access to McCormick's phone numbers. So I think you can decide this on direct appeal on the prejudice prong. I think also you can decide that this was an eminently reasonable strategy. As the court has noted, he was between a rock and a hard place here. His concession in summation was intended to basically diffuse the evidence that was on the videotape. And he was trying to gain credibility to say, look, I will forthrightly acknowledge what the video shows, but it does not show what the government claims it also shows, which is a conspiracy between Bones and McCormick. Shouldn't he have at least, shouldn't he have mentioned Yvette Williams in his closing? Your Honor, I think, well, I think he's acknowledging Yvette Williams was the person who bought the, who was at the, on the videotape. So he's pointing to that. So I'm not sure if he had another strategy here to try to attack what she did, but the evidence of her involvement and the videotape was really incontrovertible as to the two substantive counts. And so by trying to gain the jury's trust and say, look, I'm not going to deny what it shows. I think he was trying to put himself in a position to say that it does not necessarily show a conspiracy between Bones and McCormick. And this court has said in the past that kind of those strategic concessions of the less serious counts is an eminently reasonable strategy. Now as far as what the purpose of doing that was ultimately, I think, I think he was, he was trying to reduce the conduct of conviction to two small sales to try to minimize the, the, the exposure of his client, um, perhaps at sentencing to being in a tag for the entire conspiracy. What was the amount that the conspiracy was tagged with in terms of the, the, the points that were assessed, you know, for sentencing? It was 60, uh, 60 grams of crack, um, two sales that were on the video, the state videotape was what? Those were two eight ball sales. So I think it's about seven, less than seven. And I think that the, the, the actual quantity was a little less than that. Um, but the government's, you know, the, the position of the government at sentencing would be that this is all relevant conduct regardless of the conspiracy. But I think in the post booker era, you know, trying to minimize your client's conduct to down to two substantive sales makes sense because the, and, and the, it gained some traction at sentencing. If you read the sentencing transcript, uh, the judge, um, was pondering the issue of whether he should include the conspiracy, uh, amounts. Um, ultimately he decided it would come in because, uh, as a, once you've shown a conspiracy between bones and McCormick, anything that McCormick is then doing with MS is going to come in. But I think even under relevant conduct, it would come in. But, um, nevertheless, there's a, uh, in under Booker, of course, he can decide I want, I'm going to vary down because I think in, in reality, he's really only involved in these two small sales, um, as part of a conspiracy. I, you know, I, I, I, I can minimize that. And so he also departs down under the criminal history category. So there, there was, there was some effect here. I think it's not unreasonable for the attorney to say, look, I'm dealt this, this very difficult case. I'm going to try to minimize my con, my, my clients, uh, criminal culpability as much as possible. Um, and I, I, I would take issue with the idea that, that conceding, um, that that was bones, uh, sorry, that was McCormick on the videotape is necessarily a concession of, of conspiracy. Um, he argued, uh, defense attorney argued expressly that sitting next to, uh, you know, McCormick sitting next to bones is not an evidence of conspiracy. Um, he went after the, uh, the federal, uh, conf, uh, confidential informants very hard, um, and cross-examination. He, he did a credible job here. Um, this is not a case where his, his, uh, conduct fell below a reasonable standard, um, unless there's any other questions, I will thank you. Thank you. Thank you. Just briefly, um, first of all, um, my colleague, uh, refers to, uh, conceding the less serious counts, and that's just a characterization I disagree with. But isn't it a fact that what was conceded is something that could not reasonably have been denied? I mean, that's correct, but they're not less serious. That's what, that, that was my point. He conceded two counts that were not less serious than the one that ostensibly he was contesting, but conspiracy count could, could bring in its train, all kinds of other quantities based on the, on the doings of the co-conspirators. Uh, yes, but once again, as, as the government, uh, argues, uh, that might've come in as relevant conduct, even had he beaten the conspiracy. It might have, it might have, but you know, in trial, you're playing odds. True. Um, the other thing is I think you have to look at the context in which defense counsel formulated his strategy. And the context is that he, in his own words, did not understand that his client was vulnerable to being convicted of conspiracy for conspiring with this fellow named Bones. He thought the only viable conspiracy charge was the one involving Mr. McCormick and his supplier, this guy Simmons, so that his entire strategy was directed towards discrediting that. He, in fact, did a little bit of decent cross-examination that might've argued that there was only a buyer seller relationship between Mr. McCormick and Mr. Simmons. Although we might note that, sorry. Is this in fact the case, because it's my understanding that in, uh, in a summation, he says, uh, no, maybe I have this wrong. So there are these big time conspirators working together and stuff like that. Why is he the only one on the phone? Why it's not even Bones. So he talks about Bones in the summation as being part of the conspiracy. So I think he's fully aware that, uh, that, that the government is claiming that Bones is part of the conspiracy. Well, at that point he's winging it, because in his own words, he says, until the prosecutor stood up and began his, uh, his summation, I didn't even know that they were arguing the theory that my client had conspired with Bones. And as a matter of fact, so his entire trial strategy had been, uh, oblivious to that fact, and it's consistent with everything else he said during the case. He said on summation, the only potential co-conspirator here is Simmons. On his rule 29 motion, he says the only potential co-conspirator here is Simmons. And as a matter of fact, when he gets to sentencing, he even says at sentencing, I didn't even realize until summations that the potential co-conspirator was Bones. And that's the context in which he decides to concede not only the sales, but also vouch for the Schenectady Police Department's job. Thank you. Thank you both. Thanks. We'll reserve. Thank you both. Safe journey home, Mr.